APPROVED: <del>Bear</del>**14 MAG 2465**       

BENJAMIN NAFTALIS
DANIEL S. GOLDMAN
MICHAEL FERRARA
Assistant United States Attorneys

BEFORE:     THE HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA               :       SEALED COMPLAINT

     - v. -                        :       Violations of:
15 U.S.C. §§ 78j(b) &
TRENDON T. SHAVERS,                    :       78ff; 17 C.F.R.
a/k/a "pirateat40,"                        § 240.10b-5; 18 U.S.C.
:       §§ 1343 & 2
Defendant.
:       COUNTY OF OFFENSE:
- - - - - - - - - - - - - - - - x       NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

ERIC BURNS, being duly sworn, deposes and says that he
is a Special Agent of the Federal Bureau of Investigation
("FBI"), and charges as follows:

### COUNT ONE
### (Securities Fraud)

1.    From at least in or about September 2011 up
through and including in or about September 2012, in the
Southern District of New York and elsewhere, TRENDON T. SHAVERS,
a/k/a "pirateat40," the defendant, willfully and knowingly,
directly and indirectly, by the use of the means and
instrumentalities of interstate commerce, and of the mails, and
of the facilities of national securities exchanges, did use and
employ, in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made,
in the light of the circumstances under which they were made,
not misleading, and (c) engaging in acts, practices, and courses

of business which operated and would operate as a fraud and deceit upon persons, to wit, SHAVERS engaged in a Ponzi scheme in which he solicited funds on behalf of his firm, Bitcoin Savings and Trust, which funds SHAVERS both used to pay back other investors and converted to his own use, and the use of others, without the permission and authorization of his investors.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

2.    From at least in or about September 2011 up through and including in or about September 2012, in the Southern District of New York and elsewhere, TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, to wit, a wire transfer to a bank account located in New York, New York, on various occasions, including on or about July 30, 2012, writings, signs, signals, and sounds for the purpose of executing such scheme and artifice to defraud, to wit, SHAVERS engaged in a Ponzi scheme in which he solicited funds on behalf of his firm, Bitcoin Savings and Trust, which funds SHAVERS both used to pay back other investors and converted to his own use, and the use of others, without the permission and authorization of his investors.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

3.    I am a Special Agent with the FBI.  I have been involved in the investigation of this matter.  I have been a Special Agent with the FBI since November 2009, and I have been working on white collar investigations since February 2011. During this time, my responsibilities have included the investigation of securities fraud, mail and wire fraud, and other white-collar offenses.

4.   I base this affidavit on that experience, as well as on my conversations with other law enforcement agents, attorneys and staff of the United States Securities and Exchange Commission ("SEC"), and others.  I also base this affidavit on my review of numerous documents, including bank records, emails, internet relay chat conversations, interviews conducted by the SEC and a sworn deposition also taken by the SEC.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

The bases for my knowledge and the foregoing charge are, in part, as follows:

## Background on Bitcoin

5.   Based on my training and experience, I know the following about Bitcoin:

a.   Bitcoin are a decentralized form of electronic currency, existing entirely on the Internet and not in any physical form.  The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a "peer-to-peer" network.  Bitcoin transactions are processed collectively by the software-enabled computers composing the network.

b.   To acquire Bitcoin in the first instance, a user typically must purchase them from a Bitcoin "exchanger." In return for a commission, Bitcoin exchangers accept payments of currency in some conventional form (cash, wire transfer, or the like) and exchange the money for a corresponding number of Bitcoin, based on a fluctuating exchange rate.  Exchangers also accept payments of Bitcoin and exchange the Bitcoin back for conventional currency, again, charging a commission for the service.

c.   Once a user acquires Bitcoin from an exchanger, the Bitcoin are kept in a "wallet" associated with a Bitcoin "address," designated by a complex string of letters and numbers.  (The "address" is analogous to the account number for a bank account, while the "wallet" is analogous to a bank safe where the money in the account is physically stored.)  Once a

Bitcoin user funds his wallet, the user can then use Bitcoin in the wallet to conduct financial transactions over the Internet by transferring Bitcoin from his Bitcoin address to the Bitcoin address of another user.

        d.    All Bitcoin transactions are recorded on a public ledger known as the "Blockchain," which is stored on the peer-to-peer network on which the Bitcoin system operates. The Blockchain serves, among other purposes, to prevent a user from spending the same Bitcoin more than once. However, the Blockchain reflects only the movement of funds between anonymous Bitcoin addresses and, therefore, cannot by itself be used to determine the identities of the persons involved in the transactions. Only if one knows the identities associated with each Bitcoin address involved in a set of transactions is it possible to meaningfully trace funds through the system.

        e.    Bitcoin are not illegal in and of themselves and have legitimate uses.

### Background of SHAVERS and Bitcoin Savings & Trust

      6.    TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, is the sole employee and operator of Bitcoin Savings and Trust ("BCS&T"), formerly known as First Pirate Savings & Trust, an unincorporated entity, with no physical location, which offered and sold Bitcoin-related securities in BCS&T through Internet-based solicitations. SHAVERS operated BCS&T from his home in McKinney, Texas, and promised investors who invested their Bitcoin in BCS&T up to seven percent interest per week in Bitcoin -- an annualized interest rate of 3,641% per year -- based on BCS&T's purported Bitcoin market arbitrage strategy, as discussed in more detail below.

      7.    From at least in or about September 2011 up through and including in or about September 2012, TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, conducted BCS&T's business under the Internet name "pirateat40" and raised more than 764,000 Bitcoin in principal investments from BCS&T investors. The value of these 764,000 Bitcoin was about $4.5 million, based on the daily average price of Bitcoin when the BCS&T investors purchased their BCS&T investments.

      8.    SHAVERS returned about 618,000 Bitcoin to investors -- although, as is common in a Ponzi scheme, the Bitcoin were not returned proportionately to each investor's initial investment -- and misappropriated at least 146,000

Bitcoin.

    9.   At the peak of his scheme, TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, raised, and had in his possession, about seven percent of the Bitcoin that was in public circulation at the time.

    10.   In truth, TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, had no market arbitrage strategy, but instead used new BCS&T investors' Bitcoin to pay back the promised interest returns to prior BCS&T investors and misappropriated BCS&T investors' Bitcoin for his own personal use.

## The Scheme to Defraud Investors

    11.   From in or about September 2011 through in or about September 2012, TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, using the online username "pirateat40," solicited investments in BCS&T on the "Bitcoin Forum" -- a public, Internet-based forum where, among other things, Bitcoin investment opportunities were posted. SHAVERS' offer to investors was straightforward: investors who lent Bitcoin to BCS&T would be paid interest -- up to one percent per day (or seven percent per week) -- and investors could withdraw their investments in BCS&T at any time. SHAVERS claimed that the Bitcoin invested by BCS&T investors would be used to support a Bitcoin market arbitrage strategy, which included (a) lending Bitcoin to others for a fixed period of time; (b) trading Bitcoin via online exchanges; and (c) selling Bitcoin locally via private, off-market transactions -- i.e., "over-the-counter transactions." SHAVERS also personally guaranteed to cover any losses in the event of a market change. In truth, SHAVERS largely failed to execute the claimed market arbitrage strategy, failed to honor all of his investors' redemption requests as well as his personal guarantee, and failed to deliver the agreed upon rates of interest. In the end, at least 48 of approximately 100 investors lost all or part of their investment in BCS&T.

## SHAVERS' Representations to Investors

    12.   Based on my review of internet postings and chats, interviews of investors and others involved in, or knowledgeable about, BCS&T, and my conversations with attorneys and staff of the SEC, among other things, I have learned that TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, solicited investments in BCS&T, and communicated with his group of

investors through, among other means, a publicly available
Internet thread on the Bitcoin Forum originally entitled
"Looking for Lenders."[1]  SHAVERS posted numerous messages on the
"Looking for Lenders" thread, including:

         a.   On or about November 3, 2011, SHAVERS posted
a general solicitation stating that he was "selling [Bitcoin] to
a group of local people" and offered investors up to one percent
interest per day "until either you withdraw the funds or my
local dealings dry up and I can no longer be profitable."
SHAVERS further stated that a minimum of 50 Bitcoin were
required to invest with BCS&T.[2]

         b.   On or about November 11, 2011, SHAVERS was
asked by another participant how he was able to generate profits
large enough to allow him to pay his advertised rates of
interest.  SHAVERS replied: "Groups of people that want to be
off the radar, buy large quantities [of Bitcoin] and [want]
instant availability.  I would say it[']s the Hard Money sector
of Bitcoin."

         c.   On or about November 13, 2011, SHAVERS
wrote: "Hey all, I have some big orders coming in this week.  I
just wanted to thank all of my investors as I'm able to fulfill
them without the risk of them going elsewhere.  Still looking
for about 1000 [Bitcoin] total in lenders [i.e., victim-
investors] based on negotiations with my buyers in the coming
weeks.  It's growing, it[']s growing!"

         d.   On or about November 22, 2011, SHAVERS
wrote:  "As with any movements in the market up or down[,] I

---

[1] In BCS&T parlance, "lenders" refers to victim-investors who
sent their Bitcoin to TRENDON T. SHAVERS, a/k/a "pirateat40,"
the defendant, in exchange for a fixed rate of interest.  And
"clients" refers to purported borrowers to whom SHAVERS lent
Bitcoin for a fixed period of time.

A "thread" is a single conversation on a forum such as the
Bitcoin Forum.  The relevant thread is available at
http://bit.ly/1nU5Kq5.

[2] On or about November 3, 2011, SHAVERS posted a link to his
November 3, 2011 post in the "Looking for Lenders" thread (as
detailed in subparagraph (a)) in a public chat room (otherwise
known as "Internet Relay Chat" or "IRC") entitled "Bitcoin-OTC,"
which is dedicated to over-the-counter trading of Bitcoin.

have enough order activity going on that my risk is very
limited.  In most cases the [Bit]coin[] go uncovered less than a
few hours, I have yet to come close to taking a loss on any
deal.  With that said, in the event there was a huge change in
the market and I needed to personally cover the difference I am
more than willing to do so."

        e.  On December 19, 2011, SHAVERS wrote:  "I'm
meeting with a new client [i.e., purported borrower] today to
work out a deal like my other guys.  Word is he's a Big Dawg, so
hopefully we can get some more volume from him. . . . He will be
the highest volume buyer I have thus far. . . . Good times to
come."

        f.  Later on or about December 19, 2011, SHAVERS
wrote: "My clients [i.e., purported borrowers] deal in cash only
and I don't move a single [Bit]coin until the cash is in hand
and [I]'m out of harm[']s way (just in case :)).  So risk is
almost 0."

        g.  Then later on or about December 19, 2011, in
a response to a question from a participant on the forum about
Bitcoin price fluctuation, SHAVERS responded: "The prices for
picking up [Bit]coin[] from my clients [i.e., purported
borrowers] selling [Bit]coin[] is set prior to the purchases
most of the time.  Anything not covered is hedged or I take the
risk personally."

        h.  On or about December 23, 2011, SHAVERS
wrote: "My new client [i.e., purported borrower] starts on
Wednesday[,] so those waiting for new accounts and storage
availability won't have much longer to wait."

        i.  On or about December 27, 2011, SHAVERS
noted: "Received my first order from my new client [i.e.,
purported borrower]."

        j.  On or about January 4, 2012, SHAVERS was
asked by a participant on the forum: "[W]hat recourse do
investors have if you drop dead tomorrow?"  SHAVERS responded:
"Can't go into many details but I can assure you that a dead
man's switch[3] is in place. . . . I often think about my wife

---

[3] Based on my training, experience, and my knowledge of this
investigation, I know that a "dead man's switch" is a reference
to a switch (physical or otherwise) that is automatically

killing me for the insurance money."

    k. On or about January 19, 2012, a participant on the forum wrote: "IMHO [i.e., in my honest opinion] if you put your money in these schemes you deserve to lose them or be found out (I doubt pirate's [i.e., SHAVERS'] business is 100% legal)." SHAVERS immediately countered: "If my business is illegal then anyone trading [Bit]coin[] for cash and back to [Bit]coin[] is doing something illegal. :)" Later that day, SHAVERS followed up:  "Guys don't worry, when my ponzi scheme dies I'll pay those closest to me first. ;)"

    l. On or about February 3, 2012, in response to a comment made by a forum participant, SHAVERS posted: "I can get you into this rare investment opportunity but it[']s very exclusive and I'm doing you a favor here by just requiring a 200 [Bitcoin] non-refundable sign-up fee.  Trust me you will make that back in a week.  Oh and did I mention you need to jump on this now[.]  I have so many waiting on the list."

    m. On or about February 7, 2012, SHAVERS wrote that all new accounts will be activated using a new, referral-based model -- i.e., new investors in BCS&T had to be referred by current investors in BCS&T.

    n. On or about February 9, 2012, SHAVERS announced that the minimum amount required to open a new BCS&T account was now 100 Bitcoin.

    o. On or about February 10, 2012, in response to a question by another forum participant, SHAVERS wrote that BCS&T investors could have their BCS&T account set up to automatically reinvest rather than pay out earnings.

    p. On or about April 10, 2012, SHAVERS launched a website for BCS&T that allowed investors to track their BCS&T investments online and changed the name from First Pirate Savings & Trust to BCS&T.

    q. On or about May 21, 2012, in a post on another thread in the Bitcoin Forum[4], SHAVERS wrote:

---

activated if the human operator becomes unable to prevent, in this case, investors from losing their investment in BCS&T.

[4] The relevant thread is available at http://bit.ly/PxniN0.

>    Q -- Is [BCS&T] a Ponzi?
>
>    A -- Although, theoretically I could have
>    run a Ponzi scheme for a while early on, it
>    just wasn't something I would ever want to
>    be a part of.  If I wanted it to be one, it
>    would have been at much lower rates and I'd
>    be asking for everyone to join.

     r.   Later on May 21, 2012, on the same thread referenced in subparagraph (q), another forum participant asked whether SHAVERS would "disclose anything about your actual profit margins over the 7% weekly you pay for use of the funds?" SHAVERS replied: "I [] gross 10.65% per week and payout 5.98% on average and it really depends on how much I want to work."[5]

     s.   On or about July 2, 2012, SHAVERS announced that, effective August 1, 2012, (i) the interest rate paid to BCS&T investors would be lowered to 3.9% per week, and (ii) the minimum investment amount would be raised to 100 Bitcoin for all new and existing BCS&T accounts.

     t.   On or about July 23, 2012, SHAVERS announced that he was eliminating the referral requirement to open a new BCS&T account.

     u.   On or about August 17, 2012, SHAVERS closed BCS&T and posted the following notice:

>    After much consideration, I've decided to close
>    down Bitcoin Savings & Trust.
>
>    Why?
>
>    The decision was based on the general size and
>    overall time required to manage the transactions.
>    As the fund grew there were larger and larger
>    coin movements which put strain on my reserve
>    accounts and ultimately caused delays on
>    withdraws and the inability to fund orders within
>    my system.  On the 14th I made a final attempt to
>    relieve pressure off the system by reducing the

---

[5] Neither SHAVERS nor BCS&T made any reference to investors about BCS&T's charging any fees, including management fees.  The statements in subparagraph (r) are the only reference by SHAVERS that relate to any entitlement by SHAVERS to payment for BCS&T.

rates I offered for deposits.  In a perfect world this would allow me to hold more coins in reserve outside the system, but instead it only exponentially increased the amount of withdrawals overnight causing mass panic from many of my lenders [i.e., victim-investors].

So now what?

I've spoken with my clients [i.e., purported borrowers] over the last week and come to an agreement that would allow me to close down my operation within a week.  Currently my reserve (operating wallets) are drained from fulfilling the withdraw spree that happened after the rate drop announcement.  All withdraws at this point will be delayed until Monday when the shutdown process begins.

At this point I will no longer accept deposits. Any [Bit]coin[] sent into the system as of now will be returned immediately.

When will I get my [Bit]coin[]?

Starting Monday I'll begin systematically closing and withdrawing accounts as [Bit]coin[] are transferred.  I don't expect the entire process to last longer than a week. The moment your account is closed you'll receive your [Bit]coin[] plus any interest accrued up to the hour it was sent.

. . . Now, I have a lot of work to do. Stay Tuned.

### The Victims

13.  I have interviewed various individuals who invested in BCS&T.  Paragraphs 14 through 17 below set forth some of what I have learned based on my interviews with some of these investors, and my review of various documents, including victim's transaction histories, emails, and Internet chat logs and other correspondence with TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant.

**Victim-1**

14. Based on my interviews with an individual ("Victim-1") who invested approximately 12,000 Bitcoin in BCS&T, I have learned the following:

a. TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, told Victim-1 that SHAVERS had access to high net worth individuals who wanted to get into the Bitcoin market and remain off the radar. Victim-1 began to invest with SHAVERS in September 2011, and continued to invest after reading a post made by SHAVERS on the Bitcoin Forum in or about November 2011.

b. SHAVERS promised Victim-1 a return of 1.5% per day, or 10.5% per week.

c. In mid-2012, Victim-1 traveled to Las Vegas and met SHAVERS in person. The purpose of this trip was, in part and among other things, to question SHAVERS directly about BCS&T and SHAVERS' postings on the Bitcoin Forum. Victim-1 had dinner with SHAVERS and other investors at a steakhouse (the "Vegas Steak Dinner"). At the Vegas Steak Dinner, SHAVERS told Victim-1, and others, that (i) BCS&T was doing great things; (ii) that BCS&T was also trading with hedge funds; and (iii) these hedge funds were paying a hefty premium in order to borrow Bitcoin from him.

d. In total, SHAVERS failed to return at least approximately 3,000 Bitcoin to Victim-1 of his/her original investment.

**Victim-2**

15. Based on my interviews with an individual ("Victim-2") who invested approximately 3,000 Bitcoin in BCS&T, I have learned the following:

a. Victim-2 first learned about BCS&T through the Bitcoin Forum. There, Victim-2 read a posting for an investment opportunity that promised a return of one percent per day, or seven percent per week.

b. Victim-2 relied on statements by TRENDON T. SHAVERS, a/k/a "pireateat40," the defendant, on the Bitcoin Forum about how BCS&T operated and invested investors' Bitcoin, and invested based on those representations.

c. In total, SHAVERS failed to return at least

11

approximately 1,000 Bitcoin to Victim-2 of his/her original investment.

**Victim-3**

16.   Based on my interviews with an individual ("Victim-3") who invested at least approximately 1,675 Bitcoin in BCS&T, I have learned the following:

a.   Victim-3 first learned about BCS&T by speaking to another individual ("BCST Investor-1") who had previously invested in BCS&T.   Thereafter, Victim-3 read postings on the Bitcoin Forum made by TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, for the investment opportunity described by BCS&T Investor-1 that promised a return of one percent per day, or seven percent per week, and those postings mirrored the description provided to him by BCST Investor-1.

b.   Victim-3 relied on statements by SHAVERS on the Bitcoin Forum about how BCS&T operated and invested investors' Bitcoin -- namely, that SHAVERS sold Bitcoin at a premium via local, private off-markets transactions and invested based on those representations.

c.   In total, SHAVERS failed to return all of the Bitcoin Victim-3 invested, or at least approximately 1,675 Bitcoin.

**Victim-4**

17.   Based on my interviews with an individual ("Victim-4") who invested approximately 10,900 Bitcoin with BCS&T, I have learned the following:

a.   Prior to November 2011, Victim-4 communicated directly with TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, via IRC and, on several occasions, loaned Bitcoin to SHAVERS for a fixed period of time for a fixed rate of interest.   SHAVERS told Victim-4 that SHAVERS had individuals who wanted to buy Bitcoin locally and who were willing to pay SHAVERS a premium for Bitcoin.   These transactions pre-dated the formation of BCS&T.

b.   In or about November 2011, Victim-4 read about BCS&T on the Bitcoin Forum.   According to those posts, which largely mirrored the financial arrangement set forth above in subparagraph (a), SHAVERS was involved in Bitcoin market arbitrage:   SHAVERS bought and sold Bitcoin locally, via off-

market transactions, and also day-traded Bitcoin on Mt. Gox in order to take advantage of market-price fluctuations.[6]

        c.   Victim-4 traveled to Las Vegas and met SHAVERS in person.  Specifically, Victim-4 attended the Vegas Steak Dinner with SHAVERS and other investors.  At the Vegas Steak Dinner, SHAVERS told Victim-4, and others, that (i) BCS&T was not a Ponzi scheme; (ii) BCS&T was not being used to launder money or for another illegal purpose; (iii) SHAVERS had one or more bosses for whom he worked; and (iv) SHAVERS tried to manipulate the price of Bitcoin by trading large amounts of Bitcoin on Mt. Gox.

        d.   In total, SHAVERS failed to return at least approximately 3,016 Bitcoin to Victim-4.

### SHAVERS' July 2012 Bet That BCS&T Was *Not* a Ponzi Scheme

        18.  Based upon my review of another thread on the Bitcoin Forum[7], my interview of an another individual ("Individual-1"), and a review of electronic conversations between TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, and others, I know the following:

        a.   In or about early July 2012, SHAVERS and another participant on the Bitcoin Forum ("Individual-2") made a bet as to whether BCS&T was a Ponzi scheme.  Specifically, Individual-2 alleged that SHAVERS was operating BCS&T as a Ponzi scheme.  SHAVERS denied that allegation and placed a bet with Individual-2 that BCS&T was not a Ponzi scheme.

        b.   On or about July 5, 2012, SHAVERS stated: "Find a trusted escrow [for the above-referenced bet] and I['] ll bet you anything you put in it. . . . Put your money where you[r] mouth is and I'll match every [Bit]coin."

        c.   Later on or about July 5, 2012, Individual-2 proposed the following bet:  "Both I [i.e., Individual-2] and you [i.e., SHAVERS] place 5000 [Bitcoin] each into an escrow

---

[6] Mt. Gox was a Bitcoin exchange based in Tokyo, Japan, that launched in July 2010.  By 2013, Mt. Gox handled an estimated 70% of all Bitcoin transactions.  In February 2014, Mt. Gox suspended trading, closed its website and exchange service, and filed for bankruptcy.

[7] The relevant thread is available at http://bit.ly/1cWJGK7.

held by [Individual-1].  If after 2013-10-01, that's the first
of October 2013, [BCS&T] has not defaulted on payments,
Pirateat40 gets the funds.  In the case of a default, I
[Individual-2] get the funds.  A default is identified by
[BCS&T] customers' funds being locked down for two consecutive
weeks."

      d.    On or about July 6, 2012, SHAVERS,
Individual-1, and Individual-2, each agreed to the bet, which,
among other things, defined a default by BCS&T as follows: "A
default will be construed to have occurred, if at any time prior
to October 1 2013, 00.01 UTC, [BCS&T] will be late by at least
14 calendar days, in disbursing either any regularly-scheduled
interest payment, or any withdrawal request, by a valid account
holder of [BCS&T]."

      e.    Later on or about July 6, 2012, SHAVERS and
Individual-2 each sent the escrow agent, Individual-1, 5,050
Bitcoin (namely, 5,000 Bitcoin for the bet and 50 Bitcoin as a
fee to Individual-1).  (As of July 6, 2012, the value of Bitcoin
was priced at about $6.65 per Bitcoin, resulting in a bet of
about $33,500 by both SHAVERS and Individual-2.)

      f.    On or about July 20, 2012, SHAVERS and
Individual-1 had the following private, electronic conversation
regarding the above-referenced bet:  "I[']m sure the ponzi
claims will continue and kinda hope they do, so I can keep doing
what I do."

      g.    On or about August 30, 2012, Individual-1
declared Individual-2 the winner of the bet, and wrote:

> I hereby declare the bet decided, in favor of
> [Individual-2].  A withdrawal request made on
> August 15[,] 2012, is still outstanding as of
> today, Aug[ust] 30[,] 2012, which triggers
> default as specified in the contract, via "late
> by at least 14 calendar days, in disbursing
> either any regularly-scheduled interest payment,
> or any withdrawal request, by a valid account
> holder of [BCS&T]" clause.
>
> In private communication, pirateat40 [i.e.,
> SHAVERS] has agreed with this assessment and
> conceded the bet.

      h.    Also on or about August 30, 2012, SHAVERS

did in fact concede the bet and had the following private, electronic conversation with Individual-1:

Individual-1 so. . . it seems you have entered default according to the bet contract.  :(  guess [Individual-2] wins.

SHAVERS yes, [Individual-2] wins.

Individual-1 sad times.  I hope things work out for you. . . what's the deal with the lawyers and etc (if not a secret)?

SHAVERS If there is anything you need directly, you know how to contact me.  I can't speak here.

## SHAVERS' Misappropriation of BCS&T Investor Funds

19.  During the course of the scheme, between about September 2011 and September 2012, TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, misappropriated BCS&T investors' funds for his own, personal use.  Specifically, based on my review of financial and bank records, client account records and statements, and other documents, I have learned that:

 a.  SHAVERS transferred about 150,649 Bitcoin to an account in SHAVERS' name at Mt. Gox (the "SHAVERS Mt. Gox Account").  In connection with his trading on Mt. Gox, SHAVERS lost the dollar equivalent of about $434,000 and misappropriated at least the dollar equivalent of about $147,000 of Bitcoin for his own personal use.

 b.  As to the about $147,000 that SHAVERS misappropriated for his own personal use, SHAVERS transferred those funds from the SHAVERS Mt. Gox Account to accounts he controlled at an online payment processor called Dwolla, Inc. (the "SHAVERS Dwolla Account") and his personal checking account at Woodforest National Bank (the "SHAVERS Woodforest Account").[8]

---

[8] In the course of my investigation, I have determined that Woodforest National Bank uses a correspondent bank account located at Citibank in New York, New York (the "Woodforest-Citibank Account"), in order to receive, among other things, foreign, incoming wire transfers from, for example, Mt. Gox, which is located in Tokyo, Japan.  To that end, I know that when TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, withdrew money from the SHAVERS Mt. Gox Account, said withdrawal passed

SHAVERS then used those funds for, among other things, personal expenses, including casinos, restaurants, gas, groceries, entertainment, travel, and auto expenses.  For example:

c.   Between on or about March 29, 2012 and on or about April 20, 2012, SHAVERS transferred about $17,000 from SHAVERS Mt. Gox Account to the SHAVERS Dwolla Account and finally to the SHAVERS Woodforest Account.  On or about April 20, 2012, Woodforest National Bank issued a cashier's check in the amount of $17,693.95 payable to the "Autos of Dallas" and drawn from the SHAVERS Woodforest Account.  Later that day, SHAVERS delivered that cashier's check to Autos of Dallas in exchange for a 2007 BMW M5 automobile.

d.   On or about July 30, 2012, SHAVERS caused about $7,500 to be sent from the SHAVERS Mt. Gox Account to the SHAVERS Woodforest Account.  Later that day, about $6,200 was withdrawn via automatic teller machines or spent at the New York-New York Hotel and Casino in Las Vegas, Nevada.  Still later that evening, SHAVERS spent about $1,000 on dinner at the Gallagher's Steakhouse located in Las Vegas, Nevada.[9]

e.   SHAVERS also misappropriated at least an additional $75,000 (in U.S. dollars) that was sent to the SHAVERS Woodforest Account purportedly in exchange for Bitcoin for the purpose of investing in BCS&T.  In truth, SHAVERS used those funds for his own personal use, including ATM withdrawals, day spa treatments, auto merchandise, rent payments for his primary residence, and groceries.

---

through the Woodforest-Citibank Account located in New York, New York.

[9] Based on my interviews of victims and my review of documents, I believe that SHAVERS's charge at the Gallagher's Steakhouse in Las Vegas, Nevada is the Vegas Steak Dinner referenced previously.

## SHAVERS' Interview with the SEC

20.   On or about October 3, 2012, TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, was interviewed by the SEC. During that interview, SHAVERS stated in part and among other things, that:

a.    He started BCS&T in early November 2011.

b.    He was the sole person responsible for BCS&T's activities, which had no other staff or employees.

c.    He used the username "pirateat40" for his BCS&T-related activities and that statements made on the Bitcoin Forum and in Internet chat rooms under the username "pirateat40" were made by him (SHAVERS).

d.    In November 2011, he publically solicited investors for BCS&T by starting a "thread" on the Bitcoin Forum.

e.    He promised BCS&T investors that they could withdraw their invested funds at any time.

f.    At first, he called his operation "First Pirate Savings and Trust," but later marketed it as BCS&T.

g.    All of BCS&T's business was done in Bitcoin.

h.    He used new BCS&T investor funds to make interest payments and to cover withdrawal demands.

i.    In August 2012, he closed BCS&T to new investors and stopped making interest and/or principal payments to BCS&T investors.

j.    He made preferential redemptions to friends and longtime BCS&T investors.

k.    In total, BCS&T had 446 investors.  As of October 2012, he (SHAVERS) owed BCS&T investors about 336,000 Bitcoin, in both principal and interest.

## SHAVERS' Sworn Deposition to the SEC

21. On or about September 13, 2013, TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, gave a sworn deposition to the SEC. During that deposition, SHAVERS stated, under oath, in part and among other things, that:

a. SHAVERS started the BCS&T thread on the Bitcoin Forum on November 3, 2011 to solicit Bitcoin from investors in exchange for one percent daily return.

b. All posts made on the Bitcoin Forum using the username "pirateat40" were made by SHAVERS or at his direction.

c. BCS&T was allegedly primarily in the business of lending Bitcoin to "various investors or lenders" for a fixed period of time. A small percentage (about 10%) was used by SHAVERS to "buy[] and sell[] [B]itcoin[] locally."

d. Prior to December 2011, BCS&T primarily generated returns by mining and market arbitrage, and generated "very little . . . less than one percent" return by lending Bitcoin.

e. BCS&T raised about 400,000 Bitcoin from between about 40 to 100 investors, and returned at least 500,000 Bitcoin to those investors.

f. SHAVERS commingled BCS&T investors' funds with his personal Bitcoin and other non-BCS&T related businesses.

g. In or about July 2012, SHAVERS lent about 202,000 Bitcoin to a borrower he identified as "The Big One" and those 202,000 Bitcoin were never returned. SHAVERS has no record or proof that he (SHAVERS) made this loan to "The Big One," nor does SHAVERS know who "The Big One" is.

h. In or about August 2012, SHAVERS shut down BCS&T, redeemed recent investors, and kept some investor Bitcoin in order "to be able to trade so [he] could make [Bit]coin[] to pay them back."

i. SHAVERS made preferential redemptions to his long-time account holders and friends.

j.   Following his October 3, 2012 interview with the SEC, SHAVERS returned about 100,000 Bitcoin to BCS&T investors, but has no record of these transactions.

k.   SHAVERS maintained a complete record of BCS&T investor inflows and outflows, but he (SHAVERS) has "no proof of [his] lending activities," which resulted in the 202,000 Bitcoin loss.

l.   SHAVERS bet that BCS&T was not a Ponzi scheme and he lost that bet.

### Analysis of the BCS&T Accounts

22.   I have performed a financial analysis on what I understand to be BCS&T's complete transaction history (the "BCS&T Transaction History"). The BCS&T Transaction History was provided to the SEC by TRENDON T. SHAVERS, a/k/a "pirateat40," and, according to SHAVERS, is the complete history of every transaction for the Bitcoin addresses of BCS&T investors that SHAVERS had at the time he produced records to the SEC. The individual investors of BCS&T are identified in the BCS&T Transaction History using unique account names (otherwise known as Bitcoin "addresses"), which are not in an investor's true name and do not contain any contact or address information.

23.   Based on my analysis of the BCS&T Transaction History, interviews with BCS&T investors, and other documents, I have learned:

a.   Either the true name, or contact and address information, for more than about 90% of the BCS&T investors (the "Identified BCS&T Investors") -- or about 100 individuals.

b.   TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, raised a total of at least about 764,000 Bitcoin from the Identified BCS&T Investors. Of those 764,000 Bitcoin raised from Identified BCS&T Investors, SHAVERS sent about 150,649 Bitcoin (or about 20% raised by BCS&T) to the SHAVERS Mt. Gox Account, and used those Bitcoin to day trade Bitcoin. Of that about 150,649 Bitcoin, SHAVERS transferred only about 69,153 back to BCS&T and his investors.

c.   SHAVERS paid approximately 618,000 Bitcoin back to BCS&T investors in the form of interest payments and/or redemptions. Thus, at most, SHAVERS invested about 20% of the Bitcoin raised from Identified BCS&T Investors in BCS&T's purported market arbitrage scheme, and used the other about 80%

(i.e., about 618,000 Bitcoin) to keep his Ponzi scheme afloat.

          e.    SHAVERS never made a 202,000 Bitcoin loan in or about July 2012.

          f.    SHAVERS comingled BCS&T investors' Bitcoin with his own personal Bitcoin and Bitcoin earned through non-BCS&T businesses.

### Shavers Is Sued by the Securities and Exchange Commission

          24.    On or about July 23, 2013, the SEC filed a civil cause of action against TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, in the United States District Court for the Eastern District of Texas, Sherman Division, alleging certain violations of the Securities Act and Securities Exchange Act related to the fraudulent offers and sales of securities by SHAVERS and BCS&T (the "SEC Action").

          25.    In connection with the SEC Action, the United States District Court for the Eastern District of Texas, Sherman Division, ordered TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, to produce a financial accounting related to the operations of BCS&T and his own personal finances (the "Audited Accounting"). That Audited Accounting called for SHAVERS to provide the SEC with, among other things, a verified, sworn, written accounting, signed by SHAVERS that accurately identified (a) all assets and liabilities currently held by SHAVERS; (b) all assets or income received by SHAVERS over the last few years; (c) all assets or income transferred from SHAVERS to anyone else over the last few years; and (iv) the names and addresses of all individuals who presently hold the assets of SHAVERS.

          26.    To date, TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, has provided no Audited Accounting to the SEC.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of TRENDON T. SHAVERS, a/k/a "pirateat40," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.


_____
ERIC BURNS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Sworn to before me this
3rd Day of November, 2014

_____
HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK